# Illinois Official Reports

## Appellate Court

---

### *Metropolitan Water Reclamation District of Greater Chicago v.*
### *Terra Foundation for American Art,*
### 2014 IL App (1st) 130307

---

| | |
|---|---|
| Appellate Court Caption | METROPOLITAN WATER RECLAMATION DISTRICT OF GREATER CHICAGO, Plaintiff and Counterdefendant-Appellant, v. TERRA FOUNDATION FOR AMERICAN ART, Defendant (664 N. MICHIGAN, LLC, and NM PROJECT COMPANY, LLC, as Successor-in-Interest to Terra Foundation for American Art, Defendants and Counterplaintiffs-Appellees; and Unknown Owners, Nonrecord Owners, and Nonrecord Claimants, Defendants). |
| District & No. | First District, First Division<br>Docket No. 1-13-0307 |
| Filed | June 9, 2014 |
| Held<br>(*Note: This syllabus constitutes no part of the opinion of the court but has been prepared by the Reporter of Decisions for the convenience of the reader.*) | In an action arising from a dispute over an easement on plaintiff's property that defendant, as assignee of the holder of the easement rights, sought to use in constructing a 40-story commercial and residential complex on the dominant property, the appellate court affirmed the entry of a judgment against plaintiff on defendant's counterclaim for the damages arising from the construction and marketing delays caused by plaintiff's interference with defendant's exercise of its rights under the easement, since the finding that the losses alleged were caused by plaintiff's interference with defendant's use of the easement was not against the manifest weight of the evidence, plaintiff forfeited its claims that the *Moorman* doctrine barred the recovery and that the judgment was entered on unpled allegations and, forfeiture aside, the considerations behind the *Moorman* doctrine were not present, plaintiff had a duty not to interfere with defendant's use of the easement, and defendant's losses were caused by the delays; furthermore, plaintiff forfeited the claim of unpled allegations by participating and introducing evidence outside the time frame of defendant's allegations and failing to seek a bill of particulars. |

| | |
|---|---|
| Decision Under Review | Appeal from the Circuit Court of Cook County, No. 06-CH-13817; the Hon. Kathleen M. Pantle, Judge, presiding. |
| Judgment | Affirmed as modified. |
| Counsel on Appeal | Michael I. Rothstein, Gino L. DiVito, John M. Fitzgerald, and Brian C. Haussmann, all of Tabet DiVito & Rothstein, of Chicago, for appellant. |
| | Clifford Law Offices (Robert A. Clifford, Colin H. Dunn, and Robert P. Sheridan, of counsel), and David C. Gustman, Jill Anderson, and Daniel C. Curth, all of Freeborn & Peters LLP, both of Chicago, for appellees. |
| Panel | JUSTICE HOFFMAN delivered the judgment of the court, with opinion. Justices Cunningham and Delort concurred in the judgment and opinion. |

**OPINION**

¶ 1     The Metropolitan Water Reclamation District of Greater Chicago (the District) appeals from a $36,432,047 judgment entered against it and in favor of the counterplaintiff, NM Project Company, LLC (hereinafter, the Project Company). The damages were awarded after the District was found to have intentionally interfered with the easement rights of the Project Company and its predecessors-in-interest to use and enjoy an alley owned by the District. For the reasons that follow, we affirm the judgment of the circuit court, as modified.

¶ 2     The litigation in this case has developed over the course of eight years, creating a voluminous record, which we summarize here, in relevant part, to address the issues now before us.

¶ 3     The District is a municipal corporation with its headquarters at 100 East Erie Street in Chicago, near the intersection of Michigan Avenue and Erie Street. On the eastern border of its headquarters, parallel to Michigan Avenue, the District owns an alley (the Alley), which separates its property from three properties, 664, 666, and 670 N. Michigan Avenue (collectively referred to as the Property), now owned by the Project Company.

¶ 4     In June 2005, the Terra Foundation for American Art (Terra) and 664 N. Michigan, LLC, entered into an "Option and Purchase Agreement" covering the purchase and development of the Property which was then owned by Terra. Two of the three properties, 666 and 670 N.

Michigan Avenue, benefited from three recorded easements over the Alley dating back to the 1940s. The easements provided that the owners of the 666 and 670 N. Michigan parcels have "full and free right and liberty to use and enjoy" the Alley. 664 N. Michigan, LLC, planned to develop the Property by demolishing the existing buildings and constructing a 40-story luxury condominium and retail store complex. The plan contemplated use of the Alley to provide access to the proposed garage for residents of the condominium complex. Shortly after entering into the "Option and Purchase Agreement," the 664 N. Michigan, LLC, assigned its rights under the agreement to the 670 N. Michigan, LLC, of which it was the managing member.

¶ 5    Upon learning of the plans for the development of the Property at a meeting with its representatives in the summer of 2005, the District objected and contended that use of the Alley for the proposed garage exceeded the terms of the easements. Despite the District's objections, the design phase for the development of the Property immediately began and financing opportunities were pursued. By September 2005, the Ritz Carlton Corporation had been contacted regarding the use of its brand name in the marketing and the management of the condominium units to be constructed on the Property. Marketing efforts began in January 2006 based on the initial development plans, with construction projected to begin sometime between October 2006 and March 2007. Delivery of completed condominium units to purchasers was planned for early 2009.

¶ 6    On July 12, 2006, the District filed the instant action against Terra and 664 N. Michigan, LLC, seeking judicial declarations concerning the scope of the easements. The District alleged that the intended use of the Alley in connection with the development plan exceeded the scope of the easements. It further claimed that the 664 N. Michigan Avenue parcel had no easement rights, and therefore, the Alley could not be used for that parcel's benefit.

¶ 7    While this action was pending but unresolved, the District blocked access to the Alley by locking the security gate, which had been installed in 1997. The District also had cars parked in the Alley in such a manner as to block ingress and egress.

¶ 8    On April 29, 2008, the 670 N. Michigan, LLC, assigned all of its rights under the "Option and Purchase Agreement" to the Project Company. On the following day, April 30, 2008, the Project Company closed on its purchase of the Property from Terra. Thereafter, on July 2, 2008, the Project Company and 664 N. Michigan, LLC (collectively referred to as the counterplaintiffs), filed a three-count counterclaim against the District. Count I of the counterclaim sought injunctive relief and damages for the District's interference with the counterplaintiffs' right to use the Alley pursuant to the terms of the easements. Specifically, count I requested "actual damages resulting from the District's interference, as well as costs and such further relief as is just and equitable." Count II sought judicial declarations, in part, that the District had no right to: impair access to the Alley using a gate or otherwise; block the alley with vehicles; or impair the counterplaintiffs' access to the Alley to engage in construction and demolition activities associated with their development of the Property. Count II also requested "costs and such further relief as is just and equitable." Count III alleged that the District intentionally trespassed on the Project Company's property by constructing the security gate at the end of the Alley on the 664 N. Michigan Avenue property. Count III requested "actual damages and punitive damages to deter future illegal conduct," plus costs, and other such "further relief as is just and equitable."

- 3 -

¶ 9     Among the facts incorporated in all three claims, the counterplaintiffs alleged that the District had blocked access to the Alley by locking the security gate, refused to allow access to the Alley for legitimate construction purposes, and allowed its employees and other invitees to park in the Alley in a manner which obstructed ingress and egress. Specifically, the counterplaintiffs alleged that: "[i]n late 2005 and early 2006, *** [they] began offering the residential units for sale, with delivery expected in late 2009"; they had "secured the necessary financing, and anticipate[d] that the cost of the Development [would] exceed $183,000,000"; and that, in order to construct the complex, they had to demolish the existing structures on the Property. The counterplaintiffs alleged that the District's conduct prevented their construction workers from erecting scaffolding necessary for demolition activities. They also alleged that "in recent months, the District [had] embarked upon an unlawful campaign to interfere with the Alley Easement and keep the *** [counterplaintiffs] from accessing and using the Alley." After it closed on the purchase of the Property, the Project Company asked the District to remove the gate, but the District refused. Thereafter, the District began allowing vehicles to park in the Alley for entire workdays and storing garbage dumpsters in the Alley to prevent ingress and egress.

¶ 10     According to the counterclaim, the District's interference was alleged to have: impaired the counterplaintiffs' unencumbered right to use the Alley and to enjoy the 666 and 670 North Michigan Avenue properties, including their efforts to proceed with the construction of the improvements on the Property; threatened the counterplaintiffs' agreements with contractors and subcontractors, who were unable to perform their work at the time and in the manner contemplated by their respective contracts; impaired the counterplaintiffs' ability to comply with their financing agreements, equity partner agreements, and the redevelopment agreement with the City of Chicago; "threaten[ed] to deter potential customers from purchasing units in the Development"; "delayed the *** [counterplaintiffs] from obtaining a demolition permit from the City, and required [them] to incur additional expenses, including but not limited to attorneys' fees, consulting fees, and interest."

¶ 11     On August 14, 2008, after a lengthy hearing, the trial court entered a preliminary injunction against the District, enjoining it from interfering with the Project Company's use and enjoyment of the easements over the Alley. However, the trial court found that the 664 N. Michigan Avenue parcel held no rights under the easements at issue and, therefore, the Project Company had no right to use the Alley for the benefit of that parcel. The trial court further enjoined the District from parking cars in the Alley, obstructing access with a security gate, interfering with scaffolding placement, denying access to construction workers, and interfering with the removal of the security gate. The trial court specifically found that the "District began to deny access after learning of the developer's plans for the new buildings and ha[d] intensified its efforts in denying access since April 30, 2008."

¶ 12     The District appealed the trial court's preliminary injunction order, and, on April 22, 2009, this court affirmed that order. See *Metropolitan Water Reclamation District of Greater Chicago v. Terra Foundation for American Art*, No. 1-08-2223 (2009) (unpublished order under Supreme Court Rule 23). Following this court's order, the District removed the security gate from the Alley. In the interim, a February 2, 2009, trial date had been set for the Project Company's request for permanent injunctive relief.

¶ 13     On January 13, 2009, the District filed an "Emergency Motion To Sever For Trial Developer's Damage Claims." In the motion, the District stated that, on January 12, it received

- 4 -

the report of Michael LoGuidice, the Project Company's accounting expert, in which he claimed that the Project Company suffered $51 million to $86 million in damages due to delays occasioned by the District's actions. The District argued that it was unfair to expect it to review, analyze and respond to the report in such a short time frame. According to the District, the Project Company's "damage claim [was] separate and apart from the equitable claims" and "[s]evering the *** damage claims from the trial on the equitable claims *** [would] in no way prejudice the [Project Company] and [would not] delay a trial on the equitable claims." On January 14, 2009, the trial court granted the District's motion and severed the trial on the counterplaintiffs' damages claim from the hearing on the permanent injunctive relief sought.

¶ 14 On May 19, 2009, after a hearing, the trial court entered a permanent injunction consistent with the preliminary injunction it had entered on August 14, 2008.[1] First, the court found that the 664 N. Michigan Avenue parcel had no easement rights and, therefore, the Alley could not be used for activities benefitting only that parcel. As to that portion of count II of the District's complaint, the court entered judgment in its favor. Second, the District was permanently enjoined from interfering with the Project Company's use and enjoyment of the Alley easements, including parking cars in the Alley in a manner which blocked ingress and egress or interfering with construction activities benefitting the 666 and 670 N. Michigan Avenue properties. However, the District was allowed to use the Alley to store its garbage dumpsters. The issues pertaining to the security gate were moot because the District had removed it. The issues pertaining to demolition activities on the 666 and 670 N. Michigan Avenue properties were also moot because demolition had been completed after the preliminary injunction had been granted. The matter was then set for an August 2009 trial to resolve the counterplaintiffs' claim for damages.

¶ 15 On June 16, 2009, the Project Company filed a motion to amend the counterclaim to include a claim for tortious interference with prospective economic advantage, arguing that the amendment would eliminate any question as to its entitlement to damages stemming from the District's conduct predating April 30, 2008. It contended that, except for damages, the evidence already received in the case conclusively established the elements of a tortious interference with a prospective economic advantage claim, namely: (1) the existence of a valid business relationship or expectancy; (2) the District's knowledge of that relationship or expectancy; (3) purposeful interference by the District inducing or causing a breach or termination of the Project Company's relationship or expectancy; and (4) damages. *Fellhauer v. City of Geneva*, 142 Ill. 2d 495, 511 (1991).

¶ 16 On August 17, 2009, the trial court denied the Project Company's motion to amend its counterclaim, stating that it was untimely because the Project Company knew it had a claim for tortious interference with prospective economic advantage long before it filed the motion. Additionally, discovery had closed in the matter, and the District had not had a proper opportunity to defend itself against a claim for tortious interference with prospective economic advantage. The trial court noted that the elements of such a claim were different from the theories of recovery advanced by the Project Company on the trial of its equitable claims. Moreover, the trial court found that, from the evidence adduced to date, it was not readily

---

[1]The parties stipulated to the admission of the evidence adduced at the preliminary injunction hearing at the permanent injunction hearing.

apparent that the District intended to terminate a business relationship or prevent an expectancy from ripening into a valid business relationship.

¶ 17    On August 24, 2009, the hearing on the counterclaim for damages commenced. The attorneys for the parties made opening statements. Counsel for the Project Company opened by arguing that the evidence established intentional interference with the easement rights over the Alley dating back to 2005 and that the Project Company sought damages in the amount of $66,468,910. The District argued that the counterplaintiffs never alleged or referred to any conduct by the District occurring before 2008 until they tendered LoGuidice's report on January 12, 2009. Counsel also argued that the Project Company's damages were based on the speculative conclusions made by LoGuidice and that there was no evidence that the Project Company's business plans were affected by the District's conduct between March 1, 2007, and April 30, 2008.

¶ 18    On October 13, 2009, an altercation involving the use of the easement arose between a District police officer and a Project Company principal. The altercation led the Project Company to file a petition seeking an adjudication of indirect civil contempt against the District for a violation of the May 19, 2009, permanent injunction. On March 5, 2010, after a nine-day hearing, the trial court entered an order holding the District in indirect civil contempt and imposing sanctions. The District appealed, and, on June 8, 2011, this court reversed that judgment. *Metropolitan Water Reclamation District of Greater Chicago v. Terra Foundation for American Art*, No. 1-10-0971 (2011) (unpublished order under Supreme Court Rule 23). Those proceedings delayed the course of the hearing on the counterclaim for damages.

¶ 19    During the course of the hearings on the counterclaim for damages, the District requested time to depose LoGuidice and additional discovery time in order to respond to his report. The trial court granted its requests in August 2010.

¶ 20    We begin summarizing the trial testimony with that of Jon Kurt Rodgers, a Project Company principal, who testified that he and his partner, Bruce Schultz, met with District representatives in late summer of 2005 regarding the development plan for the Property and their intention to use the Alley pursuant to the rights granted under the easements. He stated that the District representatives became hostile and denied that they had any rights to use the Alley. Rodgers admitted that, despite the District's objections to the development plan, financing options and the sale of condominium units began in the first quarter of 2006. He testified that the Project Company closed on the purchase of the Property on April 30, 2008, and thereafter demanded access to the Alley. Rodgers explained that the District had locked the gate and had vehicles parked in the Alley in a manner which blocked ingress and egress to or from the Property, preventing the construction workers' ability to erect scaffolding required by the City of Chicago to protect against pieces of the 664 building's façade from falling to the street. Regarding the cars parked in the Alley, Rodgers admitted that he did not begin to see the parked cars until after the April 30, 2008, closing. Rodgers did testify, however, that sometime in the fall of 2007 the District locked the gate across the Alley, interfering with access to the Property. Rodgers also admitted that construction could not begin until after the Project Company closed on the Property.

¶ 21    Bruce Schultz, also a Project Company principal, testified that he signed the purchase agreement with Terra as a representative of the 664 N. Michigan, LLC, despite the District's opposition to the development, because he and the company's attorneys believed that the easement language was unambiguous and that the dispute with the District would be resolved

quickly. He stated that, by fall of 2007, he had met with the District at least five times and amended the design of the project in order to satisfy its concerns, hoping that the dispute would resolve. Regarding the delay in construction, Schultz testified that the District's refusal to allow access to the Property through the Alley resulted in an approximately one-year delay, including delays in: the demolition of the old structures on the Property, obtaining the necessary construction and mezzanine loans; and beginning construction on the planned buildings.

¶ 22    Regarding the financing delays, Schultz testified that, by September 2005, $17 million in financing for the project had been obtained. After that, applications for mezzanine and construction loans were made. Schultz explained that, in order to obtain a construction loan, the borrower must complete an application, the borrower and lender meet to negotiate the terms, the lender issues a conditional commitment, the borrower makes a cash deposit, and the lender then undertakes a due diligence investigation, which could take 30 to 90 days to complete. Only after the lender completes a due diligence investigation is final loan approval possible. According to Schultz, loan details from Corus Bank were obtained in September 2005, but the application was not pursued because the dispute with the District would have frustrated the loan process during the due diligence phase.

¶ 23    By September 2007, Schultz realized that the dispute with the District was not going to quickly resolve. At that time, he renewed financing efforts and applied for loans through Helaba Bank. The Project Company eventually secured the required financing after it obtained title insurance for the Property through Chicago Title and Trust. The Chicago Title and Trust underwriter read through the easements and the litigation file and agreed to issue a title insurance policy. Thereafter, on November 28, 2007, Helaba Bank approved the loan for $137 million, and the Project Company closed on the Property and the loan on April 30, 2008.

¶ 24    Regarding the delay in actual construction, Schultz expected construction approval for the 664 N. Michigan Avenue parcel from the Landmark Commission in the first quarter of 2006, but admitted that approval was not obtained until March 1, 2007. Schultz also testified that demolition permits were issued by the City of Chicago for the 666 and 670 N. Michigan buildings in August 2008 and for the 664 building in December 2008. He stated that, in general, demolition permits are issued within two weeks of submitting the application. According to Schultz, had the Project Company not been required to obtain injunctive relief to gain access to the Property through the Alley, the required permits would have been applied for and obtained in late 2006, or early 2007, as expected.

¶ 25    Schultz testified that, between 2005 through May 2008, free access to the Alley was blocked because the security gate was locked. Under the purchase agreement, however, the Project Company and its predecessors had rights to access the Property "24/7" in order to complete asbestos and other environmental testing in preparation for the purchase of the Property. According to Schultz, the asbestos inspector was approached and threatened by District personnel when he performed the asbestos assessment.

¶ 26    Regarding preconstruction condominium sales, which commenced in early 2006, Schultz testified that demolition of the old structures should have begun between October 2006 and March 2007, with construction beginning by February 1, 2007. The planned condominium units were projected to be delivered to the purchasers by late 2008 or early 2009.

¶ 27    Based on market analysis reports, 24 units were projected to be sold in 2006. Twenty-five contracts for the sale of condominium units were actually executed by the end of 2006. It was

expected that the remaining units would be sold by the end of 2008, which would have paid off the construction loan. However, sales dropped off in 2007, with only two units selling that year. Schultz testified that he noticed a decline in sales and interest in the Property after two newspaper articles were published in 2007 regarding the District's objection to the project. Even after demolition began in August 2008, only two units sold in the first quarter of 2008. According to Schultz, the poor sales were attributable to negative publicity and the fact construction was stalled due to the District's conduct. He denied offering any discounted pricing or any special price incentives in 2006, but admitted that, in 2007 and 2008, discounts, concessions, and free upgrades were offered to induce sales of the four units that were sold during that period. Because the units did not substantially sell out before completion of the building as had been anticipated, the Project Company had to expend additional money to relocate the sales center from its original location at 625 N. Michigan Avenue to an on-site location. Schultz estimated the additional cost was approximately $600,000.

¶ 28    Regarding litigation related to the delayed construction, Schultz testified that three pending lawsuits had been filed by purchasers of condominium units seeking to cancel their contracts on the basis that the Project Company failed to timely deliver the units. Schultz stated that he hired a law firm to defend the suits and that the legal fees were still accumulating.

¶ 29    Jane Shawkey, a Rubloff Residential Properties (Rubloff) real estate agent, testified that she first became involved in the project in 2004 when she prepared a feasibility study, reflecting that a strong market existed in Chicago for luxury condominium units. When the sales center opened at 625 N. Michigan Avenue in March 2006, she anticipated selling 50% of the units within 18 months and expected delivery of the units by late 2008. Shawkey stated that initial interest in the project was high. Numerous prospective buyers visited the sales center and 24 of them signed contracts to purchase units to be constructed on the Property. She noted that interest declined in 2007 as the three old structures on the Property had not yet been demolished, and the projected 2008 date for delivery of the units appeared unlikely. Shawkey stated that, in 2007, a revised delivery date was announced and even that date was pushed back several times thereafter. At the time of her 2009 testimony, she stated that the estimated delivery date was the first quarter of 2011. Shawkey admitted that, since construction began in August 2008, she had not noticed an increase in sales activity and that the last contract for the sale of a unit was signed in March 2008.

¶ 30    Rachel Bailey, also a Rubloff real estate agent working on the project, testified consistently with Shawkey. Bailey stated that, because of the delays in construction, the prices of the units officially increased by 7%. She further stated that there were "unofficial" price increases after the Project Company asked her and Shawkey to "tweak" the pricing to cover the costs of the delay.

¶ 31    John Marks, a retired real estate developer, testified that he learned about the project in late 2006 or early 2007 and was interested in purchasing a condominium unit. After he was told that 40% of the units had been sold, Marks decided not to sign a contract. Marks stated that, based on his real estate development experience, he concluded that construction should have started with 40% of the units sold, and he knew that the units could not be delivered by 2009. He testified that he was aware of the dispute with the District. In mid-2008, Marks purchased a unit in a competing luxury condominium building.

¶ 32    Gail Lissner, vice president of Appraisal Research Counselors, an independent real estate appraisal research and counseling firm, testified that, in the spring of 2005, she prepared a

market study report, concluding that the ultra-luxury market niche was underserved in Chicago and that the intended project to be constructed on the Property was feasible. She testified that, in the strong real estate market conditions between 2005 and 2007, she predicted that the planned 88 condominium units would be sold within a three-year period from the start of the marketing campaign. According to Lissner, after the 2008 economic downturn, the real estate market saw cancellations in contracts, pricing discounts, and halted development projects. She predicted that it would require 25% to 35% discounts to sell the remaining units in the project because of the poor market conditions after 2007.

¶ 33   During the course of trial, on April 28, 2011, the District moved *in limine* to bar LoGuidice's report and testimony, arguing that the allegations in the counterclaim did not conform to the time frame contained in his report and, therefore, his opinions, which were based on an expected construction start date of March 1, 2007, should be barred. The court denied the motion on the basis that it was untimely, noting that evidence of conduct and events predating April 2008 had already been admitted and that extensive discovery had been taken by both parties.

¶ 34   LoGuidice, the Project Company's forensic accountant, testified that he first issued his report in this case in early 2009 and had updated it in July 2010 and March 2011. He concluded that demolition of the old structures on the Property could have started in March 2007, but for the actions of the District. Construction of the planned buildings eventually started in September 2008. Accordingly, LoGuidice determined that the District's conduct resulted in an 18-month construction delay. Using that 18-month delay, LoGuidice employed critical path analyses, considering the project and the tasks and operations that needed to occur in order to reach certain milestones. By way of example, once the 664 N. Michigan Avenue building obtained Landmark Commission approval in March 2007, construction could have commenced. LoGuidice testified that, although the District's conduct did not impact or delay the Landmark Commission's approval, demolition permits could have been obtained earlier than 2008 had the District not interfered with the Project Company's access to the alley. He also noted a two-month delay in obtaining permits to begin foundation work.

¶ 35   Regarding sales of the condominium units, LoGuidice determined that the District's conduct resulted in a 31-month "marketing" delay, which he explained was the additional time required to sell the condominium units. LoGuidice estimated damages using the current list prices of the condominium units and then applying a 10%, 15%, or 20% discount factor under the assumption that discounts would be necessary to sell the remaining units in the complex.

¶ 36   Regarding the 18-month financing delay, LoGuidice concluded that financing for the project could have been obtained in 2005. He compared the 2005 Corus Bank loan terms and conditions with those of the 2007 Helaba Bank loan. LoGuidice explained that, although financing could have been obtained in 2005, there was "no point" in having the loans issued when construction could not commence until Alley access was secured. LoGuidice testified that "because the District blocked the Alley, they made it impossible to get the loan closed until there was a title commitment." LoGuidice further opined that the Project Company would not have been required by the lender to obtain a second tranche of mezzanine financing in March 2010 had the condominium units been completed and sold as projected because the revenue from unit sales would have paid down the construction loan sooner. He stated that the assumption of the second tranche of mezzanine financing caused the Project Company to incur significant increased mezzanine loan interest costs.

¶ 37    LoGuidice testified consistently with his spreadsheet of figures, summarizing his estimated damages as follows:

| | |
|---|---|
| Increased construction costs: | $5,397,265 (based on 18-month delay) |
| Increased const. mgmt. expenses: | $461,166 (based on 20-month delay) |
| Increased real estate transfer taxes: | $52,500 |
| Legal defense fees: | $167,569 |
| Increased ground lease costs: | $2,083,333 (based on 20-month delay) |
| Increased mezzanine loan interest: | $24,808,793 (based on 20-month delay) |
| Cost of new sales center: | $603,562 |
| Additional Terra rent payments: | $284,575 |
| Increased marketing and adv.: | $2,996,264 |

¶ 38    Explaining his estimates, LoGuidice testified that the real estate transfer tax had been raised from $3.75 per $500 of sale price to $5.25 per $500 by the City of Chicago during the 18-month delay. The ground lease payment figure represented the amount of rent per year ($1,250,000) that the Project Company paid to Terra. The additional Terra rent represented the cost that the Project Company incurred for the storage of Terra's art and for temporary space rent while it waited for Terra's space in the new development to be constructed. The time period that he used was June 1, 2007, through September 1, 2008 (16 months).

¶ 39    LoGuidice also estimated damages in other areas, including increased financing fees ($3,945,642); increased monthly expenses ($4,161,216); increased construction loan interest ($2,636,286); and loss of investment ($19,845,438). His total estimated damages ranged from $43,154,432 to $66,568,910, depending on the discount factor applied (10%, 15%, or 20%).

¶ 40    On June 23, 2011, at the conclusion of the Project Company's case, the District moved for a directed judgment, arguing in part that the damages sought were speculative. In its reply brief supporting the motion, filed on July 5, 2011, the District argued for the first time that the economic loss doctrine (see *Moorman Manufacturing Co. v. National Tank Co.*, 91 Ill. 2d 69 (1982)) barred the Project Company from recovering its economic losses in a tort claim. The trial court denied the motion.

¶ 41    In the District's case-in-chief, Richard Lanyon, its general superintendent, testified that he was aware of the development plan for the Property in 2005. However, he did not recall any request for access to the Alley prior to the filing of the counterclaim in 2008. Lanyon denied that the District ever blocked the Alley, stating that whenever access was requested, it was granted. Specifically, he denied that the District barred Alley access prior to the entry of the injunction order in August 2008. He further denied ever issuing an order that barred Project Company personnel from entering the Alley.

¶ 42    The District's forensic accounting expert, Louis Dudney, testified that he reviewed LoGuidice's reports and found numerous errors in his calculations. He admitted, however, that he did not compute an alternative damages amount because doing so required an entirely new and complex analysis, necessitating more than simply replacing the 20-month or 18-month delay assumptions that LoGuidice based his calculations upon.

¶ 43    According to Dudney, LoGuidice erred by double counting the repayment of $28.7 million in principal for the second tranche of mezzanine financing and improperly including the interest on the mezzanine and construction loans, resulting in an overstatement of damages. He also believed that LoGuidice erred by: using the incorrect interest terms for the Corus Bank loan; inappropriately applying an accrued 1.5% interest factor to the construction loan;

overstating damages for ground lease payments to Terra by $650,000; using outdated London Interbank Offered Rate (LIBOR) projections; using speculative discounting scenarios; and selecting the March 1, 2007, date for his "but for" assumptions. According to Dudney, financing for the project could have been pursued earlier and that any delay in securing financing for the project was not caused by the District. On cross-examination, Dudney admitted that he had no issue with LoGuidice's mathematical calculations, although he did not agree with his 18-month or 20-month delay assumptions.

¶ 44 Following the close of evidence, the parties filed briefs setting forth their respective positions. In its closing trial brief, the District argued, *inter alia*, that the economic loss doctrine barred the damages claimed by the Project Company.

¶ 45 In a 36-page order, the trial court analyzed the issues raised by the parties. As to the District's argument that the Project Company could not claim damages for conduct predating the April 30, 2008, closing date, the trial court found that the overwhelming evidence adduced at the injunctive-relief trial proved that the District intentionally interfered with the easement rights encumbering the Alley beginning in 2005 and continuing until the preliminary injunction order was entered in August 2008. The court stated that the evidence established that the District learned of the proposed development plan in 2005 and intensified its interfering conduct after April 30, 2008. The court also noted that the District itself had elicited testimony regarding conduct predating April 30, 2008. Thus, the court concluded that the District could not claim to be surprised about the relevant time frame at issue.

¶ 46 Next, the trial court rejected the District's argument that the Project Company was limited to contract damages by reason of the economic loss doctrine because: (1) the District forfeited the argument by raising it for the first time after the trial was completed, and (2) the doctrine did not apply to intentional torts. The court determined that a cause of action grounded in intentional interference with easement rights paralleled two recognized exceptions to the economic loss doctrine, namely: intentional interference with a contract and intentional interference with business expectancy. The court also concluded that the doctrine did not apply to trespass claims.

¶ 47 Regarding the merits of the Project Company's case, the court made, in relevant part, the following factual findings. First, the evidence presented established that there was an 18-month delay, March 2007 through September 2008, in the commencement of construction attributable to the District's conduct and that it was the District's intentional obstruction of the Alley that proximately caused the Project Company's delay damages. The court found that the evidence established that the proposed plan for the 664 N. Michigan Avenue building was approved by the Landmark Commission in March 2007 and that demolition could have begun by then as the other two parcels did not require Landmark Commission approval. The court also found that the evidence established that financing for the project was delayed because construction could not begin until the easement dispute was resolved. The court noted that, beginning in late 2007, the Project Company was finally able to obtain title insurance, and that, as a result, the construction and mezzanine loans which the project required took an additional six months to obtain, delaying the closing until April 2008.

¶ 48 Further, the court relied upon LoGuidice's testimony in support of its finding that all of the "critical milestones" necessary to commence construction were either completed or could have been completed by March 2007, but for the actions of the District. While the court did not award damages for the construction loan interest costs based on the differences in the Corus

Bank and Helaba Bank loan terms because it determined that such differences were speculative, the court found that the increased mezzanine loan interest costs for the second tranche of mezzanine financing were not speculative as the costs had actually been incurred because of the delay in the project's completion. The court also stated that LoGuidice's opinion as to the 31-month marketing delay was "amply supported" by his analyses using credible sources and data, including the testimony of Lissner, Marks and the Rubloff sales agents.

¶ 49 Based on the evidence, the court computed its judgment in favor of the Project Company on count I of the counterclaim, alleging interference with the easement as follows: $5,397,265 for additional construction costs; $2,996,264 for advertising and marketing expenses; $249,004 for additional Terra rent payments; $387,587 for construction management expenses; $603,562 for the cost to build a new sales center; $52,500 for additional real estate transfer taxes; $61,966 for legal fees incurred in other litigation; $1,875,006 for additional ground lease payments; and, $24,808,793 for increased interest on the mezzanine loan. The court also entered a $100 judgment in favor of the Project Company for nominal damages on its trespass claim as pled in count III. Fourteen days later, the District filed its timely notice of appeal.

¶ 50 In urging reversal, the District argues that: (1) the economic loss doctrine bars recovery for the type of damages awarded by the circuit court; (2) the judgment was based in part upon conduct that was not alleged in the counterclaim; and (3) the damage award is against the manifest weight of the evidence. From the outset, we note that the District has made no argument in its briefs before this court contesting in any way the trial court's finding that it did, in fact, intentionally interfere with the Project Company's right to use the Alley beginning in 2005 and continuing until the injunction prohibiting its conduct issued in August 2008. Therefore, our analysis of the issues raised starts with this proposition as an established fact.

¶ 51 In support of its first argument that the economic loss doctrine bars recovery for the $36,432,047 in damages awarded to the Project Company, the District contends that recovery for economic losses occasioned by disappointed commercial expectations are not recoverable in tort. In response, the Project Company asserts that the trial court properly determined that the District forfeited its argument in this regard by failing to raise it as an affirmative defense or in a motion to dismiss, but instead improperly raising it for the first time after the trial was completed. On the merits of the issue, the Project Company argues that the economic loss doctrine has no application to intentional torts such as the one involved in this case.

¶ 52 We review the forfeiture issue using an abuse of discretion standard. See *Hanley v. City of Chicago*, 343 Ill. App. 3d 49, 53-54 (2003). The question of whether the economic loss doctrine is applicable to damages sustained as the result of an intentional tort is one of law, and, therefore, our review of that issue is *de novo. Bogner v. Villiger*, 343 Ill. App. 3d 264, 267-68 (2003); *Smith v. Intergovernmental Solid Waste Disposal Ass'n*, 239 Ill. App. 3d 123, 134 (1992).

¶ 53 Addressing the circuit court's finding that it forfeited the economic loss argument, the District relies upon the holding in *Rosos Litho Supply Corp. v. Hansen*, 123 Ill. App. 3d 290, 293-94 (1984), *overruled in part on other grounds, 2314 Lincoln Park West Condominium Ass'n v. Mann, Gin, Ebel & Frazier, Ltd.*, 136 Ill. 2d 302 (1990), which concluded that a defendant is not required to raise the economic loss doctrine earlier than in a posttrial motion. Under the facts of this case, we disagree.

¶ 54　　　The economic loss doctrine as a defense to the damages claimed by the Project Company presented a legal question which could have been easily resolved much earlier in the proceedings through a motion to dismiss or a motion for summary judgment, long before the close of a lengthy damages trial. See *Production Specialties Group, Inc. v. Minsor Systems, Inc.*, 513 F.3d 695, 699 (7th Cir. 2008) (finding the defendant's motion for a new trial was "not the appropriate place to raise for the first time arguments that could have been brought earlier in the proceedings," including its economic-loss argument which could have been "easily resolved at the summary judgment stage or even as a motion to dismiss for failure to state a claim"). Here, the District failed to raise the argument at any stage of the proceedings prior to the Project Company having rested its case for damages on June 22, 2011. It failed to raise the defense after it received the damages report of the Project Company's forensic accountant, LoGuidice, in January 2009, five months prior to the permanent injunction hearing. Even after the District received LoGuidice's report, it did not object to the requested damages; rather, it sought merely to sever the damages claim from the equity claims. The District's failure to raise the argument earlier prejudiced the Project Company by depriving it of an opportunity to renew its motion to amend the counterclaim or otherwise address this issue before it participated in the lengthy trial on damages. See *Kaiser Agricultural Chemicals v. Rice*, 138 Ill. App. 3d 706, 713 (1985) (finding that the plaintiff forfeited its defense to the defendant's counterclaim based upon the economic loss doctrine by failing to raise the defense in its answer; "[a] party may not raise on appeal defenses not interposed in its answer before the trial court [citation], even where it appears that the evidence presented could have supported that defense").

¶ 55　　　Although some courts in other jurisdictions have determined that the economic loss doctrine is not an affirmative defense (see *Tarrant County Hospital District v. GE Automation Services, Inc.*, 156 S.W.3d 885 (Tex. Ct. App. 2005)), section 2-613(d) of the Code of Civil Procedure (735 ILCS 5/2-613(d) (West 2012)) encompasses both affirmative defenses and other grounds "which, if not expressly stated in the pleading, would be likely to take the opposite party by surprise" and requires such defenses or grounds to be plainly set forth in the answer or reply. This the District failed to do. We find, therefore, that the trial court did not abuse its discretion in holding that the District forfeited its economic loss argument by failing to raise it at an earlier stage in the proceedings.

¶ 56　　　Forfeiture aside, for the reasons which follow, we conclude that the economic loss is inapplicable to a claim based upon intentional interference with an easement. In *Moorman*, the supreme court held that a plaintiff cannot recover for solely economic losses under the tort theories of strict liability, negligence, and innocent misrepresentation. *Moorman*, 91 Ill. 2d at 91; *In re Chicago Flood Litigation*, 176 Ill. 2d 179, 198 (1997). The court defined economic losses as those sustained by reason of " 'inadequate value, costs of repair and replacement of the defective product, or consequent loss of profits–without any claim of personal injury or damage to other property ***' [citation] as well as 'the diminution in the value of the product because it is inferior in quality and does not work for the general purposes for which it was manufactured and sold.' [Citation.]" *Moorman*, 91 Ill. 2d at 82. The doctrine "stems from the theory that tort law affords a remedy for losses occasioned by personal injuries or damage to one's property, but contract law and the Uniform Commercial Code (810 ILCS 5/1-101 to 1-209 (West 1996)) offer the appropriate remedy for economic losses occasioned by

diminished commercial expectations not coupled with injury to person or property. [Citation.]" *Mars, Inc. v. Heritage Builders of Effingham, Inc.*, 327 Ill. App. 3d 346, 351 (2002).

¶ 57    The *Moorman* court articulated three exceptions to the economic loss doctrine; namely, circumstances where: (1) the plaintiff sustains personal injury or property damage, resulting from a sudden or dangerous occurrence (*Moorman*, 91 Ill. 2d at 86); (2) the plaintiff's damages are proximately caused by a defendant's intentional, false representation, *i.e.*, fraud (*Moorman*, 91 Ill. 2d at 88-89); and (3) the plaintiff's damages are proximately caused by a negligent misrepresentation by a defendant in the business of supplying information for the guidance of others in their business transactions (*Moorman*, 91 Ill. 2d at 89). *In re Chicago Flood Litigation*, 176 Ill. 2d at 199.

¶ 58    Following *Moorman*, courts recognized other situations in which the doctrine is inapplicable. In *Congregation of the Passion, Holy Cross Province v. Touche Ross & Co.*, 159 Ill. 2d 137, 162-64 (1994), the supreme court recognized an exception for professional liability actions where extracontractual duties exist, such as those duties running between an attorney or accountant and a client. The court explained that the "ultimate result of the relationship between the professional and a client is something intangible," as the value of the services rendered "lies in the ideas behind the documents, not in the documents themselves." *Id.* at 163. Thus, the court concluded that "[a]pplication of the *Moorman* doctrine limiting recovery of purely economic losses to contract *** is inappropriate where a relationship results in something intangible." *Id.* at 164; see also *Collins v. Reynard*, 154 Ill. 2d 48, 52 (1992) (finding attorney malpractice claims are excepted from application of the economic loss doctrine).

¶ 59    In *2314 Lincoln Park West Condominium Ass'n v. Mann, Gin, Ebel & Frazier, Ltd.*, 136 Ill. 2d 302, 315 (1990), the supreme court noted other situations in which this court has distinguished *Moorman* and allowed tort actions seeking damages for economic losses to proceed, including actions for intentional interference with a contract (*Santucci Construction Co. v. Baxter & Woodman, Inc.*, 151 Ill. App. 3d 547 (1986)) and intentional interference with prospective business advantage (*Werblood v. Columbia College of Chicago*, 180 Ill. App. 3d 967 (1989)). The supreme court noted that, "[t]he principle common to those decisions is that the defendant owes a duty in tort to prevent precisely the type of harm, economic or not, that occurred." *2314 Lincoln Park West*, 136 Ill. 2d at 315. As the *Werblood* and *Santucci* courts explained, the questions addressed and decided in *Moorman* and its progeny were not intended to abolish causes of action for intentional interference with contract and prospective advantage. *Werblood*, 180 Ill. App. 3d at 973 (quoting language of *Santucci*); *Santucci*, 151 Ill. App. 3d at 553. "The purpose of imposing liability in tort upon persons who interfere with the contractual relations of others is to protect one's interest in his contractual relations against forms of interference which, on balance, the law finds repugnant." *Santucci*, 151 Ill. App. 3d at 553.

¶ 60    Similar to the torts of intentional interference with a contract or with prospective business advantage, a claim of intentional interference with an easement seeks to protect the interests of those in possession of real property against unreasonable interference with their rights to access and use their property. Unlike situations involving commercial transactions or defective goods to which the *Moorman* doctrine has traditionally been applied, the case at bar originates in property law where the duties running between dominant and servient estate holders have been long recognized. As the supreme court has noted, the "concept of duty" has been "at the

- 14 -

heart of the distinction drawn by the economic loss rule" (*2314 Lincoln Park West*, 136 Ill. 2d at 314), and the "principle common" to the recognized exceptions to the doctrine is that "the defendant owes a duty in tort to prevent precisely the type of harm, economic or not, that occurred" (*id.* at 315). Here, the District had a duty not to interfere with the Project Company's use of the easement and to prevent the precise type of harm that occurred. See 28A C.J.S. *Easements* § 91, at 396 (2008) (discussing dichotomy of interests between servitude estates); see also *McMahon v. Hines*, 298 Ill. App. 3d 231, 235-36 (1998) (discussing rights of dominant and servient estate holders to reasonable use of property subject to easement).

¶ 61    Historically, tort damages have been allowed for interferences with easements. See *Page v. Bloom*, 223 Ill. App. 3d 18, 23 (1991) (affirming a judgment for lost crop profits where the plaintiff established that his damages were caused by the defendants' obstruction of an easement); *Can Am Industries, Inc. v. Firestone Tire & Rubber Co.*, 631 F. Supp. 1180, 1184 (C.D. Ill. 1986) (awarding punitive damages where the servient owner blocked the dominant estate's easement); *LeClerq v. Zaia*, 28 Ill. App. 3d 738, 742-43 (1975) (affirming punitive and nominal damages judgment where the dominant estate/defendant was proven to have intentionally interfered with the servient estate/plaintiff's property when it damaged the roadway upon which it had ingress and egress rights).

> "An easement holder is entitled to such damages as are proximately caused by a wrongful interference with the easement, and the easement owner is entitled to such damages as naturally and proximately result from the act complained of, and such as would fairly and reasonably compensate him or her for the wrong suffered \*\*\*. Even if plaintiffs are unable to prove any injury or actual damage, they are entitled to nominal damages where defendants impaired enjoyment of plaintiffs' use of a right-of-way over defendants' land, as the law presumes damage in order for plaintiffs to vindicate their rights." 28A C.J.S. *Easements* § 278, at 507-08 (2008).

¶ 62    The considerations behind the economic loss doctrine articulated in *Moorman* are not present here. This is not a situation where, at the time the easement was created, the parties to the easement could have allocated their risks as in contract or where the Uniform Commercial Code applies. See *Mars, Inc.*, 327 Ill. App. 3d at 351.

¶ 63    The District also contends that *In re Chicago Flood Litigation* supports its argument that actions involving property rights are subject to the economic loss doctrine. In that case, the supreme court did hold that a "plaintiff in a private nuisance action may recover all consequential damages flowing from the injury to the use and enjoyment of his or her person or property. \*\*\* However, recovery of damages for solely economic loss is not permissible." *In re Chicago Flood Litigation*, 176 Ill. 2d at 207. However, the court did not distinguish between negligent or intentional nuisance claims; rather, it merely stated that the policy behind the economic loss doctrine was to avoid the open-ended economic consequences of a single negligent act, such as the sudden flood occurrence at issue. *Id*. Here, however, we have an on-going, continuous, and intentional interference with easement rights by the District, including the physical blocking of ingress and egress from the Property in order to prevent or discourage its development. Unlike the circumstances present in *In re Chicago Flood Litigation*, the damages suffered by the Project Company in this case were the very damages the District sought to inflict upon it, namely, to prevent or delay the development of the Property.

- 15 -

¶ 64     In this case, the Project Company presented evidence of the costs it incurred as a result of the District's intentional interference with its right to use the easement, including costs incurred by reason of increased interest obligations and increased rent payments. The losses sought by the Project Company do not relate to the "inadequate value, costs of repair and replacement of [a] defective product, or consequent loss of profits" or the "diminution in the value of the product because" of inferior quality as the *Moorman* court defined economic losses, nor were they the result of an isolated negligent act. Rather, the losses sought are consequential damages which the Project Company incurred by reason of the delay caused by the District's ongoing interference with its ability to use the alley to access and develop the Property.

¶ 65     We believe that the holder of rights under an easement is entitled to recover damages, including for economic losses, proximately caused by the intentional interference with those rights. See 28A C.J.S. *Easements* § 279, at 509 (2008); Restatement (Third) of Prop.: Servitudes § 8.3, at 492-93 (2000); see also *Wells v. Sanor*, 151 S.W.3d 819, 825 (Ky. Ct. App. 2004) (measure of damages for interference with easement includes the diminution in value of the use of the property during the time the obstruction continued and the rental value of property is a relevant factor in determining the amount of damages); *Mondelli v. Saline Sewer Co.*, 628 S.W.2d 697, 699 (Mo. Ct. App. 1982) ("easement holder is entitled to such damages as are proximately caused by wrongful interference with the easement," including, if obstruction is temporary, the "reduction in rental value of the property" during obstruction or "any special damages which may be established"). Accordingly, even if the District had not forfeited its argument, we agree with the trial court that the economic loss doctrine does not apply to bar the Project Company's recovery of damages for economic losses it incurred as a proximate result of the District's intentional interference with the easements at issue.

¶ 66     We next address the District's contention that the court erred in awarding damages for conduct which exceeded the counterclaim's factual allegations and legal claims. In support of its contention in this regard, the District makes a number of arguments, namely that: (1) the circuit court's award of damages beyond that which the Project Company sought in its counterclaim is void; (2) the circuit court erred in awarding damages for conduct which occurred outside of the period pled in the Project Company's counterclaim; (3) the circuit court erred in awarding damages based upon an unpled cause of action, namely, intentional interference with a business expectancy; and (4) the Project Company lacked standing to claim interference with easement rights occurring prior to April 30, 2008.

¶ 67     On the issue generally, the Project Company argues that by failing to timely object to the admission of evidence of conduct predating April 30, 2008, the District forfeited the argument. It notes that the District's motion to bar LoGuidice's report on the basis that his opinions relied on events predating the closing was denied by the trial court as untimely because the motion was not filed until April 28, 2011, long after evidence of damages predating April 30, 2008, had been admitted in evidence without objection.

¶ 68     We agree with the Project Company that the District forfeited its argument that the judgment was entered on unpled allegations. "An objection that an issue was not raised in the pleadings can be waived by the objecting party's conduct at trial, or by the introduction of evidence on the issue." *In re T.B.*, 195 Ill. App. 3d 919, 923 (1990); see also *Schwarzbach v. City of Highland Park*, 82 Ill. App. 3d 807, 810 (1980). Here, the District failed to timely object to the evidence and itself introduced evidence regarding conduct predating April 30,

2008. The trial court denied the District's motion *in limine* to bar LoGuidice's damages testimony on the basis that the District had failed to timely object to the evidence and had taken discovery over the course of two years. Additionally, the trial court observed that other evidence of conduct occurring between 2005 and 2008 had already been admitted without objection during the hearings addressing the injunctive relief sought. The trial court also explained that its ruling on the issue did not conflict with its denial of the Project Company's motion to amend its counterclaim in 2009, noting that the motion to amend was ruled upon two years before trial and focused on adding a *new* claim, not on the admission of evidence. Based on these facts, we find that the District forfeited its argument that the court's damages judgment was improperly based upon unpled allegations. Moreover, the District cannot claim it was prejudiced by an alleged variance between the proofs and the allegations in the counterclaim where it participated in discovery and itself introduced evidence relating to conduct predating the April 30, 2008, closing. See *In re Detention of Hayes*, 2014 IL App (1st) 120364, ¶ 30 ("While the black letter law states that proof without pleading is as defective as a pleading without proof, the objecting party must show prejudicial effect of the variance.").

¶ 69        Forfeiture aside, we also reject the District's arguments on their merits. Relying on *Ligon v. Williams*, 264 Ill. App. 3d 701 (1994), the District argues that the judgment against it is "void" because the trial court lacked jurisdiction to enter a judgment based upon unpled allegations and an unpled cause of action. However, we find its reliance upon on *Ligon* misplaced. *Ligon* involved a court's *sua sponte* custody order entered when the complaint in the case did not raise the issue of custody. *Ligon*, 264 Ill. App. 3d at 702-04. Here, however, the justiciable issue of damages resulting from the District's alleged interference with the easements was clearly presented in the counterclaim. Thus, the circuit court had subject matter jurisdiction to enter the judgment and its order is not void. Rather, the District's contentions that the judgment was improperly entered on unpled allegations or an unpled cause of action raise only questions of whether the judgment is voidable. See *In re Custody of Ayala*, 344 Ill. App. 3d 574, 584 (2003) ("A voidable judgment is one entered erroneously, either through mistake of fact or law or both, by a court having jurisdiction and is not subject to collateral attack.").

¶ 70        Next, the District contends that the trial court erred by awarding damages for conduct which occurred outside of the period pled in the counterclaim. As an initial observation, we note that the counterclaim is rather vague as to the period covered. To be sure, it references acts of alleged interference occurring after April 30, 2008, such as the District's refusal to allow the Project Company to deliver scaffolding through the Alley on May 15, 2008, and the locked security gate across the Alley which prevented a representative of the Project Company along with employees of the a construction company from delivering construction materials to the Property on June 26, 2008. However, the counterclaim also references alleged acts of interference occurring at times no more specific than "in recent months" and "for extended periods of time." The prayer for relief requested damages "resulting from the District's interference" without specifying any time frame. If the District was confused as to the time period of its alleged interference, it could have requested a bill of particulars (see 735 ILCS 5/2-607 (West 2008)), but did not.

¶ 71        Assuming for the sake of analysis that the counterclaim as pled refers only to alleged acts of interference with easement rights occurring after April 30, 2008, the record is clear that during the injunction phase of the proceedings both the Project Company and the District presented evidence addressing the District's conduct prior to April 30, 2008, all without

objection. Consequently, the District cannot claim either surprise or prejudice when the same evidence was presented during the subsequent hearing on damages. Contrary to the District's assertion that it was prevented from examining witnesses concerning its pre-April 30, 2008, conduct, the record reflects that the District was allowed to fully explore the timing and progress of the Property's development and the effects of its interference with the easement rights over the Alley both pre- and post-April 30, 2008, that it was allowed to thoroughly cross-examine LoGuidice, and that the District presented evidence to refute LoGuidice's assumptions and calculations.

¶ 72 In response, the Project Company requests that we use our authority pursuant to Illinois Supreme Court Rule 362 (eff. Feb. 1, 1994) and grant its motion to amend the counterclaim to conform to the proofs in order to cure any technical defect in the pleadings that may exist. The Project Company seeks to add five additional paragraphs which it asserts are supported by the proofs. Those paragraphs contain the following allegations: (1) beginning on or about June 21, 2005, the Project Company entered into a series of agreements with Terra regarding the development of the three properties; (2) based on those agreements, the Project Company had a reasonable expectation of proceeding with its development plans in a timely manner as it pursued financing options in late 2005 and began selling condominium units in early 2006 with expected delivery by late 2009; (3) the District learned about the proposed development plan in 2005 and (4) "immediately thereafter, the District began to purposefully interfere" with the plan by preventing access to the alley; and, (5) the District's wrongful interference caused a significant and material breach in the Project Company's business expectancy, delaying all aspects of the development.

¶ 73 The District objects for three reasons: (1) the new count neither states a claim upon which relief can be granted nor was proven at trial; (2) the Project Company did not challenge the circuit court's denial of its initial motion to amend; and (3) the District would be severely prejudiced by injecting a new cause of action into the litigation at this stage. Regarding the sufficiency of the claim, District contends that the new count does not specify a third party toward whom the District directed any activity and with whom the Project Company lost a business relationship. Rather, the original counterclaim and the proposed new count make only a general reference to interference with the Project Company's own development activities, such as financing, contracting, permitting, demolition, and construction. Regarding prejudice, the District contends that the amendment would deprive it of the opportunities to demand a jury trial, take important discovery, and raise additional defenses. The District also argues that the original counterclaim alleged conduct that occurred only after April 2008 while the proposed amendment alleges conduct occurring from 2005 through 2008.

¶ 74 "The purpose of Rule 362 is to amend the pleadings to conform to the evidence presented at trial" where the amendment is necessary, will not prejudice the adverse party, and the issues sought to be raised by the amendment are supported by the facts in the record on appeal. *Sylvester v. Chicago Park District*, 179 Ill. 2d 500, 511 (1997). To the extent the Project Company's motion seeks to amend the counterclaim to include allegations of conduct dating back to 2005, we grant its motion as the evidence presented at trial supports the judgment entered. See *Pickett v. First American Savings & Loan Ass'n*, 90 Ill. App. 3d 245, 249 (1980) ("In the interest of justice, we amend the complaint to conform the pleadings to the proof presented at trial ***."). In this case, the District's conduct predating the April 30, 2008, closing was addressed not only during the hearing on damages, but also during the

injunctive-relief hearings. The District was also presented with LoGuidice's report in January 2009, and the trial court granted its motion to sever the damages trial in order for it to prepare, obtain additional discovery, and secure its own expert to rebut LoGuidice's opinions. The District cannot claim prejudice where it was afforded the opportunity to fully defend itself against the Project Company's position that it suffered damages as a result of the District's interfering conduct predating the April 2008, property closing. Moreover, the evidence adduced at trial established that the District's intentional interference began as early as 2005 when it learned of the intended development of the Property served by the easements. For these reasons, we grant the Project Company's motion to amend the counterclaim to the extent it seeks to add allegations, conforming to the proofs, of the District's conduct predating April 30, 2008.

¶ 75       We deny, however, that portion of the Project Company's motion that seeks to amend the counterclaim to include a new claim against the District, namely, intentional interference with prospective economic advantage. In that regard, we agree with the trial court. The inclusion of a new cause of action at this late date would prejudice the District as it contains elements that the District was not called upon to refute during any stage of the litigation. Specifically, the District was never called upon to defend against the allegations that it either knew of the Project Company's expectation of entering into a valid business relationship with some specified third party and that its purposeful interference prevented that expectancy from ripening into a valid business relationship. See *Fellhauer*, 142 Ill. 2d at 511. We view an attempt to amend a pleading to conform to the proofs on the issue of damages entirely differently than a motion to amend which seeks to interject an entirely new cause of action.

¶ 76       Next, the District argues that the trial court erred by awarding the Project Company damages based upon the theory of interference with prospective economic advantage; a theory which was never pled in the counterclaim. We reject the argument for two reasons. First, as stated earlier, the trial court denied the Project Company's motion to amend its counterclaim to include such a cause of action. Second, and more telling, is the fact the trial court's judgment order specifically states that damages were awarded only based upon the District's intentional interference with easement rights and trespass.

¶ 77       We also reject the District's indirect argument that the Project Company lacked standing to recover damages incurred before the April 30, 2008, closing. The District has framed the standing argument only in terms of the Project Company's failure to allege conduct in the counterclaim predating the April 30, 2008, closing. However, the District fails to cite to any authority supporting its standing argument. Therefore, as the Project Company argues, the argument has been forfeited. See Ill. S. Ct. R. 341(h) (eff. Feb. 6, 2013); *Bohne v. La Salle National Bank*, 399 Ill. App. 3d 485, 498 (2010) (points not supported by authority are forfeited on appeal). We note also that objections to a party's standing are forfeited if, as in this case, they are not raised timely in the trial court. *Greer v. Illinois Housing Development Authority*, 122 Ill. 2d 462, 508 (1988); *Contract Development Corp. v. Beck*, 255 Ill. App. 3d 660, 664 (1994).

¶ 78       Forfeiture aside, we point out that the 2005 purchase agreement provided that Terra granted the 664 N. Michigan, LLC, access to the property. Specifically, the 2005 purchase agreement provided that "Terra grants to *** [664 N. Michigan, LLC] and its designees the right to enter upon the property to survey the Property and to perform test borings of the soil

- 19 -

*** and such other tests, inspections and investigations as Company deems necessary in its sole and absolute discretion."

¶ 79 Accordingly, under the 2005 purchase agreement, the Project Company and its predecessors-in-interest had license to access the Property prior to the closing. *O'Hara v. Chicago Title & Trust Co.*, 115 Ill. App. 3d 309, 320 (1983) (stating that a "license, as it relates to real property, is permission to do an act or a series of acts upon the land of another without possessing any estate or interest in such land"). As Terra's licensee, the Project Company and its predecessors-in-interest enjoyed the easement rights which Terra enjoyed as the language of the easements clearly state that the easement rights flow to the property owners, heirs and assigns and allow ingress and egress for them and their tenants, servants and licensees. See *Metropolitan Water Reclamation*, No. 1-08-2223, slip order at 5-6 (quoting the easements at issue here).

¶ 80 Therefore, even had the District not forfeited the standing argument, the evidence established that the Project Company, although not the record property owner, acquired rights under the Alley easements as assignee of the 2005 purchase agreement. See 28A C.J.S. *Easements* § 58, at 485 (2008) ("In general, standing to sue to enforce the use of an easement is commensurate with the right to use the easement, regardless of whether the suitor holds title to the benefited property."); Restatement (Third) of Prop.: Servitudes § 8.1, at 474 (2000) ("A person who holds the benefit of a servitude under any provision of this Restatement has a legal right to enforce the servitude. Ownership of land intended to benefit from enforcement of the servitude is not a prerequisite to enforcement, but a person who holds the benefit of a covenant in gross must establish a legitimate interest in enforcing the covenant."); see also *Tower Asset Sub Inc. v. Lawrence*, 152 P.3d 581, 584 (Idaho 2007) (agreeing with Restatement (Third) of Property that a party has standing to enforce the right to use an easement if he has the right to benefit from the easement and title ownership is not a necessary prerequisite).

¶ 81 Finally, the District contends that the trial court's factual findings, that it caused the Project Company's 18-month construction delay and 31-month marketing delay, are against the manifest weight of the evidence. The District contends that the evidence established that the Project Company's alleged damages were caused by its own business decisions. The District also asserts that the nominal award of $100 for the trespass claim was improper. We disagree.

¶ 82 A judgment is against the manifest weight of the evidence only if the opposite conclusion is clear or where the trial court's findings appear to be unreasonable, arbitrary, or not based on evidence. *1472 N. Milwaukee, Ltd. v. Feinerman*, 2013 IL App (1st) 121191, ¶ 13. "Stated differently, a factual finding is against the manifest weight of the evidence when an opposite conclusion is apparent or when the findings appear to be unreasonable, arbitrary, or not based on the evidence." *Id.* (citing *Eychaner v. Gross*, 202 Ill. 2d 228, 252 (2002)). " '[A] reviewing court should not overturn a trial court's findings merely because it does not agree with the lower court or because it might have reached a different conclusion had it been the trier of fact.' " *Id.* (quoting *In re Application of the County Treasurer*, 131 Ill. 2d 541, 549 (1989)). To warrant reversal of a damages award, we must find that the trial judge either ignored the evidence or that its measure of damages was erroneous as a matter of law. *Id.* An award of damages is not against the manifest weight if there is an adequate basis in the record to support the trial court's assessment. *Id.*

¶ 83 In this case, there is clearly an adequate basis in the record to support the court's finding that the Project Company's demolition and construction activities were delayed by the

District's conduct as of March 1, 2007–the date when the Landmark Commission approved the demolition of the 664 N. Michigan building. Further, witnesses for the Project Company testified that, until the District ceased blocking access to the alley, it had no reason to finalize financing and close on the property as it would have incurred interest costs while the project was at a standstill. Witnesses also testified regarding the impact the District's conduct had on the marketing and sales of the planned condominium units. While the District refuted that it caused these construction and marketing delays through the testimony of its expert, Dudney, the trial court, as the trier-of-fact, had the duty to make credibility determinations and resolve conflicts in the evidence. *People ex rel. O'Malley v. Illinois Commerce Comm'n*, 239 Ill. App. 3d 368, 380-81 (1993). Here, the trial court found the opinions of LoGuidice credible and well-supported and determined that the evidence established that the District's conduct caused the 18-month construction delay and 31-month marketing delays. We have reviewed the testimony of both LoGuidice and Dudney and conclude that LoGuidice's testimony, which was accepted by the trial court, was sufficient to support the court's conclusion that the District's intentional conduct caused the damages which it awarded, and its resolution of these issues is not against the manifest weight of the evidence. Since the trial court's findings are not contrary to the manifest weight of the evidence, we will not disturb them on review. However, we modify the award to $35,762,047, as the parties agree that the trial court's mezzanine loan interest value inadvertently included $670,000, attributed to the two-month permit delay which the trial court determined was not caused by the District's conduct.

¶ 84 We also disagree with the District's position that LoGuidice's calculated damages were speculative, remote, or uncertain. Rather, LoGuidice's figures were based on known historical factors. For instance, regarding the "marketing delay," his figure was based on the market conditions in 2006-2007, the sales velocity before the negative publicity ensued and the costs of maintaining the sales office, the website, sales personnel, and advertising for the extended 31 months needed to sell the units. Increased construction costs were derived from the widely accepted Marshall and Swift indices for the 18 months that construction was at a standstill. Like the construction costs and marketing costs, the costs of extra rent to Terra, relocating the sales center, real estate transfer taxes, and litigation fees related to buyers backing out of their contracts were derived from historical numbers, not on future costs, lost profits, or expenses. Finally, the increased mezzanine loan interest costs had been realized because the lender required the second tranche of financing to be assumed in March 2010, after the delay in condominium sales caused the construction loan to become imbalanced. Thus, we reject the District's position that LoGuidice's estimates were speculative and uncertain.

¶ 85 We further reject the District's argument that the $100 nominal damages award for the trespass claim was against the manifest weight of the evidence as nominal damages may always be awarded for legal injury arising from trespass. See *Krejci v. Capriotti*, 16 Ill. App. 3d 245, 247 (1973). Here, there was evidence that the District installed the gate on the 664 N. Michigan property line, requiring removal which did not occur until sometime after the preliminary injunction was entered in August 2008.

¶ 86 For the reasons stated, we grant the Project Company's motion to amend the counterclaim to the extent indicated, and we affirm the judgment of the circuit court of Cook County as modified to reflect the reduction in the mezzanine loan interest value by $670,000.

¶ 87 Affirmed as modified.