2023 IL App (4th) 220900

NO. 4-22-0900

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

FILED
June 7, 2023
Carla Bender
4th District Appellate
Court, IL

| | | |
|---|---|---|
| JAMES DOWNING, as Trustee of the | ) | Appeal from the |
| James Downing Irrevocable Trust; | ) | Circuit Court of |
| MARI ELLEN DONOVAN; JULIE FOWLER; | ) | McLean County |
| BRADLEY SWEARINGEN; SUSAN JACKSON; | ) | No. 21MR147 |
| AMY GILL; BEVERLY REES; CONNIE HARMON; | ) | |
| DIANA PETRIK; KRISTIN MILLER; and | ) | |
| GEORGE T. WHITE, | ) | |
|      Plaintiffs-Appellees, | ) | The Honorable |
|      v. | ) | Rebecca S. Foley, |
| WILLIAM D. SOMERS and SHARI G. SOMERS, | ) | Judge Presiding. |
|      Defendants-Appellants. | | |

PRESIDING JUSTICE DeARMOND delivered the judgment of the court, with opinion.

Justices Cavanagh and Zenoff concurred in the judgment and opinion.

**OPINION**

¶ 1        This case centers upon plaintiffs' express access easement traversing defendants' land. Plaintiffs (collectively, Downing) filed a two-count complaint against defendants (collectively, the Somerses), seeking a declaratory judgment they are entitled to the express easement, unimpeded, over defendants' property and seeking permanent injunctive relief prohibiting defendants from obstructing the easement. Pursuant to section 2-1005(a) of the Code of Civil Procedure (735 ILCS 5/2-1005(a) (West 2020)), Downing moved for summary judgment, which the circuit court granted. When the Somerses filed a motion to reconsider, the court denied it, but further explained its reasoning for granting summary judgment.

¶ 2        On appeal, the Somerses argue the circuit court misapplied the law to disputed facts, making summary judgment inappropriate. We disagree and we affirm the circuit court's judgment.

¶ 3                                    I. BACKGROUND

¶ 4        In May 1981, George and Bess White purchased a certain 2.45 acres in McLean County, Illinois, which included "an access easement" appurtenant to the land. The trustee's deed conveying the land noted and located the access easement. Downing, the Whites' heirs, now own this land and the rights under the access easement. From 1981 to 2005, either the Whites or their tenant farmer used the easement to access farmland.

¶ 5        Meanwhile, in June 1990, the Somerses purchased a homestead bordering the White's property and the easement. Living near the easement, the Somerses knew it existed when 15 years later 60 acres surrounding their home went to public auction. Before acquiring the land, on March 3, 2005, the Somerses' attorney inquired about the easement, writing:

> "I would like to request, on behalf of [the Somerses], that the land owners to the north of the property they are purchasing, release and waive any right to the access easement across the property. I believe that access strip is across the property they now own and the property they are purchasing. We would like both to be released."

Downing refused to release the easement. The Somerses still purchased the 60 acres and the deed conveying the land (dated March 9, 2005) identified the access easement and excepted it from the transaction.

¶ 6        Almost immediately, in or about April 2005, the Somerses interfered with Downing using the easement. They first disked the land and then planted grass and trees, which impeded access. Downing complained about these obstructions, and the Somerses eventually removed

them. But in 2007, the Somerses erected fencing over the easement as part of a horse corral, once more preventing access to the easement. Downing again objected to this obstruction and "ask[ed] that the horse corral be removed so that our tenant can safely access our fields." The Somerses knew of Downing's objections, recalling "there had been some letters going back and forth" about the fence in 2007 and 2008, yet they did not remove the fence and they resumed planting in the easement. From 2007 to 2020, owing to obstructions placed by the Somerses, Downing and the tenant farmer had no way to travel across the easement and had to access their farmland by Route 51.

¶ 7        Downing eventually resumed objecting to the fence. In June 2020, upon advice from their attorney, the Somerses installed gates to allow access to the easement. Those gates, however, were not large enough to allow large farm equipment through them. The Somerses then installed bigger double gates, secured by chains and GateHands (a brand of gate latches). At the time of the Somerses' depositions in 2022, there were three sets of double gates across the easement, which corralled four horses. The Somerses testified they fenced, and then gated, the easement out of convenience for their horses—"and to be able to rotate pasture simply where they still had access to this dry lot [where there was water and shelter], we made pastures around it with access so no matter which pasture they're in, it's always open so they can come in and drink. If the weather is bad, they can go to the lean to shelter. So it was for convenience for those reasons." When asked if they had land that could potentially corral their horses that did not impede the easement, the Somerses admitted they had another enclosed pasture on the north side of their property, north of the dry lot specifically, but it was being used for other purposes.

¶ 8        In March 2021, Downing initiated this litigation, filing a two-count complaint against the Somerses. Count I sought declaratory judgment "that Plaintiffs have and are entitled to

an express easement over and across Defendant's property," defining "the extent and parameters of the easement and that the easement be cleared of all impediments to access at Defendant's cost." Count II sought permanent injunctive relief requiring the Somerses "to dismantle and take down the offending structures located within the easement and restore the easement to its use as access" and prohibiting the Somerses "from planting [and] growing crops within the easement area" or "from further obstruction or violation of the easement." The Somerses answered the complaint by raising two affirmative defenses, abandonment and laches, and leveling a counterclaim seeking declaratory judgment that their "current use of their property is not an unreasonable obstruction to [Downing's] use of their easement" and arguing Downing's "current actions are an unlawful attempt to expand the scope of their easement."

¶ 9        Downing eventually moved for summary judgment, designating as evidence the tenant farmer's affidavit, excerpts from the Somerses' depositions, the trustee's deed granting the Whites the easement, the March 3, 2005, letter from the Somerses' attorney asking for the easement to be released, and a March 5, 2008, letter from Downing's attorney asking for the fences to be removed. The Somerses opposed summary judgment, arguing genuine issues of material facts remained, which necessitated a trial. They designated portions from their depositions, excerpts from Amy Gill's deposition, and affidavits from Shari and Sadie Somers. Following a hearing, the circuit court entered its decision on the record, finding:

> "There is no genuine issue of material fact as to the following: There is an express easement in this case created by deed in 1981. The [Somerses] purchased the acreage next to their home in 2005. They were fully aware that there was an easement of access

- 4 -

across the ground. The [Somerses] inquired about the release of the easement at the time of their initial purchase of the ground.

[The Somerses] then engaged in a pattern of later blocking the easement so it could not be used by planting crops at one point; by planting trees, which are no longer present; and by ultimately putting up a fence, initially without at gate.

In 2020, the [Somerses] put in three double gates so the tenant farmer could then gain access.

The Court finds there is no genuine issue of material fact with respect to the issue of intent to obstruct the easement. The [Somerses] knew when they purchased the land that the easement existed. They were aware of the easement and the fact that it could not be blocked. And they chose to block it by various methods, including trees; crops; and, ultimately fences; later adding three sets of gates.

*** 

Because the Court finds that the obstruction of the easement was intentional, the Court further finds there is no genuine issue of material fact, and summary judgment and accordingly [Downing's] motion will be granted."

It issued a written order in due course, declaring Downing is "entitled to an express easement over and across [the Somerses'] subservient land as more fully described in the Trustee's Deed *** dated May 18, 1981." The order "mandatorily enjoined [the Somerses] to remove the structures

and trees within the easement and restore the easement to its use as access to [Downing's] adjoining dominant land within ninety (90) days." The court "permanently enjoined [the Somerses] from further obstruction of the easement and from committing any acts or taking any course of conduct that would obstruct the easement declared above and evidenced by the express grant by Trustee's Deed referred to above." The court denied the Somerses' counterclaim.

¶ 10      The Somerses filed a timely motion to reconsider, arguing the circuit court misapplied the law in granting summary judgment and its order deprived them of use of their land and effectively gives Downing ownership of the access easement and them an easement over their own land. Following a hearing, the court took the matter under advisement. In a new order, the court reiterated its prior findings, specifically "[a]s the obstruction of these easement was intentional, this court found, no genuine issue of material fact existed, and summary judgment was proper." The court rejected the Somerses' argument "they did not intend to block the easement; rather, they intended that the erection of the fences keep in their horses." The court found "[a]ll of [the Somerses'] actions leading up to the installation of gates in the fences—planting of trees, planting of crops, erection of gateless fences—allow the court to conclude that they intended to block [Downing's] right of access." The court concluded: "Although it was perhaps not expressed very artfully, this court ultimately elected not to consider the reasonableness of [the Somerses'] actions, as it found they had intentionally blocked [the] easement." Accordingly, the court denied the motion.

¶ 11      This appeal followed.

¶ 12                    II. ANALYSIS

¶ 13      The Somerses challenge the circuit court's entry of summary judgment as erroneous and contrary to law, raising three arguments: (1) as part of its intentionality analysis "the court

should have considered the comparative value of [the Somerses'] desire to safeguard their horses with the enclosure," (2) "[t]he court misapplied the law" because "gates across easements are reasonable impediments when they are necessary to keep livestock safe," and (3) the court's order "has erroneously deprived [the Somerses] of the use of their land and essentially given [Downing] ownership of the access and [the Somerses] an easement across their own land." We disagree and affirm the court's judgment.

¶ 14        Summary judgment is appropriate where "the pleadings, depositions, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." 735 ILCS 5/2-1005(c) (West 2020). Our supreme court observed "[t]he purpose of summary judgment is to determine whether a question of fact exists." *Busch v. Graphic Color Corp.*, 169 Ill. 2d 325, 333, 662 N.E.2d 397, 402 (1996). A circuit court's ruling on a motion for summary judgment presents a legal question we review *de novo*. *Mayfield Cooper Brotze v. City of Carlinville*, 2021 IL App (4th) 200369, ¶ 27, 183 N.E.3d 251. We can affirm the court's summary judgment " 'on any basis appearing in the record whether or not the court relied on that basis or its reasoning was correct.' " *Seymour v. Harris Trust & Savings Bank of Chicago*, 264 Ill. App. 3d 583, 598-99, 636 N.E.2d 985, 996 (1994) (quoting *Ray Dancer, Inc. v. DMC Corp.*, 230 Ill. App. 3d 40, 50, 594 N.E.2d 1344, 1351 (1992)).

¶ 15        "An easement is a right or a privilege in the real estate of another," (*Beloit Foundry Co. v. Ryan*, 28 Ill. 2d 379, 388, 192 N.E.2d 384, 390 (1963)), best described as the right to enter, use, or control someone else's land for a specific limited purpose. See Black's Law Dictionary 285 (5th pocket ed. 1996). When the easement is used to benefit another piece of land it touches, it is called an easement appurtenant. *Beloit*, 28 Ill. 2d at 388; see *Taylor v. Lanahan*, 73 Ill. App. 3d

829, 832, 392 N.E.2d 425, 428 (1979). Two estates are necessary for an easement appurtenant—"the dominant to which the right belongs, and the servient upon which the obligation rests." *Chicago Title & Trust Co. v. Wabash-Randolph Corp.*, 384 Ill. 78, 84, 51 N.E.2d 132, 135-36 (1943). Here, Downing holds the dominant estate while the Somerses hold the servient estate, meaning Downing enjoys the right to use a portion of the Somerses' land for a limited, specific purpose.

¶ 16        Easements appurtenant run with the land, meaning they continue benefiting the dominate estate and burdening the servient estate until the dominant-estate holder either terminates or abandons the easement. *Beloit*, 28 Ill. 2d at 388. This remains true even when new owners take possession of the dominant and servient estates. We previously explained: "Once created, easements appurtenant run with the land and pass by deed of conveyance (*Kuecken v. Voltz*, 110 Ill. 264 (1884)), and purchasers of land burdened with an easement take the land subject to easements expressly created of which they have notice [Citations.]" *Aebischer v. Zobrist*, 56 Ill. App. 3d 151, 155, 371 N.E.2d 1003, 1006 (1977). Accordingly, the Somerses took title to the 60 acres subject to Downing's access easement.

¶ 17        Easements come in various shapes and sizes depending upon the parties' purposes or needs. "A principle of concurrent, rather than exclusive, use underlies the law concerning easements." *McMahon v. Hines*, 298 Ill. App. 3d 231, 239, 697 N.E.2d 1199, 1206 (1998). Though certainly unintentional, Woodie Guthrie aptly described easement-law when he intoned, "This land is your land, this land is my land." See Woodie Guthrie, This Land Is Your Land (Folkways Records & Serv. Corp. 1967). Ideally, both the dominant and servient estates should be able to use the land comprising the easement. *McMahon*, 298 Ill. App. 3d at 239. But what amounts to acceptable use by either estate depends upon the purpose of the easement when it was created.

*Seymour*, 264 Ill. App. 3d at 594 (" '[T]he use to which an easement is devoted or for which it is granted determines its character.' " (Internal quotation marks omitted.) (quoting *Schnuck Markets, Inc. v. Soffer*, 213 Ill. App. 3d 957, 974, 572 N.E.2d 1169, 1182 (1991))).

¶ 18            The deed granting this easement labels it an "access easement," which Black's defines as "[a]n easement allowing one or more persons to travel across another's land to get to a nearby location, such as a road." Black's Law Dictionary 285 (5th pocket ed. 1996). Access easements are comparable to right-of-way or ingress-and-egress easements, which give the dominant estate holder the right to use the servient estate to enter and leave its property. See Black's Law Dictionary 286 (5th pocket ed. 1996). As a practical matter, the easement at the center of this case is both an access easement and ingress-and-egress easement because it allows Downing to access a road (County Road 700 North) at one end while it also allows Downing to enter and exit its farmland at the other end.

¶ 19            Generally, "[t]he owner of the dominant estate is entitled to the necessary use." *Flower v. Valentine*, 135 Ill. App. 3d 1034, 1039, 482 N.E.2d 682, 687 (1985). For an access easement specifically, necessary use amounts to unobstructed use. Indeed, established Illinois law provides that "the owner of an easement of right-of-way for ingress and egress has the right to use the full width of the easement area, unhampered by any obstructions." *McMahon*, 298 Ill. App. 3d at 236 (citing *Schaefer v. Burnstine*, 13 Ill. 2d 464, 469-70 (1958)). "This general rule creates a presumption that anything in an easement will be considered an obstruction and thus may not remain ***." *Seymour*, 264 Ill. App. 3d at 606. This rule allows for one exception—any "natural obstructions, such as bushes and trees, which existed at the time of the grant of the easement and were not placed there by the owner of the servient estate" need not be removed. *Valentine*, 135 Ill. App. 3d at 1040. The dominant estate holder, however, does not enjoy free reign over the easement

and must not change the easement to increase the burden on the servient estate. *McMahon*, 298 Ill. App. 3d at 239.

¶ 20    This general rule and one exception do not leave the servient estate without use of its land. Recall, the law underlying easements strives for concurrent use. Dating back nearly a century, " 'the law is well settled that the owner of real estate, subject only to a public or private easement, has the right to use his property for any purpose which he may deem proper, so long as the use to which it is put does not interfere with the proper enjoyment of the easement which is held by the public or by a private person therein.' " *Peoples Gas Light & Coke Co. v. Cook Lumber Terminal Co.*, 256 Ill. App. 357, 367, (1930) (quoting *Tacoma Safety Deposit Co. v. City of Chicago*, 247 Ill. 192, 196, 93 N.E. 153, 155 (1910)). Put another way, "the servient owner may use his property for any purpose consistent with the dominant owner's enjoyment of his easement." *McMahon*, 298 Ill. App. 3d at 239. As the burdened estate, the servient estate is limited in only two ways. It may not interfere with the dominant estate's use of the easement, meaning it must use the land in way that is consistent with the dominant estate's use of the easement.

¶ 21    Before invoking a court's equity to protect rights under an easement, a party must submit clear and convincing proof that the easement exists "so as to remove every substantial doubt of the existence of such rights." *Chicago Title & Trust Co.*, 384 Ill. at 84. "Mandatory injunctions are proper even for minor interference with use of an easement appurtenant." *Seymour*, 264 Ill. App. 3d at 596 (citing *Mutual of Omaha Life Insurance Co. v. Executive Plaza, Inc.*, 99 Ill. App. 3d 190, 195, 425 N.E.2d 503, 507 (1981)). If a court finds a party acted intentionally or culpably negligently when encroaching upon an easement, it need not balance the equities before granting an injunction. *Seymour*, 264 Ill. App. 3d at 603 (citing *Borrowman v. Howland*, 119 Ill. App. 3d 493, 502, 457 N.E.2d 103, 108 (1983)).

¶ 22                    A. The Somerses Intentionally Obstructed the Easement

¶ 23         Though multilayered, the Somerses' first argument essentially takes aim at the circuit court's finding they acted intentionally in blocking the easement. Premised on their belief that "courts consider and decide claims of intentional interference with an easement in the same way they consider claims of intentional interference with a contract or prospective business advantage," the Somerses argue the court's intentional-conduct analysis should have first determined if their actions were privileged and then whether they were unjustified or malicious before deeming them intentional. They contend the court's analysis should have balanced the comparative value of keeping their horses in an enclosure against the value of Downing using the easement unimpeded. Since there is no compelling precedent for this position, we disagree.

¶ 24         The Somerses base this argument on one sentence in a case addressing and analyzing the economic loss doctrine, namely *Metropolitan Water Reclamation District of Greater Chicago v. Terra Foundation for American Art*, 2014 IL App (1st) 130307, ¶ 60, 13 N.E.3d 44. That case involved an alley separating one property from three other parcels. Since the 1940s, two of the three parcels "benefited from three recorded easements over the Alley" which gave them " 'full and free right and liberty to use and enjoy' " the alley. *Metropolitan*, 2014 IL App (1st) 130307, ¶ 4. The servient estate, nevertheless, blocked the easement by locking the security gate and parking cars in the alley. *Metropolitan*, 2014 IL App (1st) 130307, ¶¶ 7, 9. During the resultant litigation, the parties exchanged claims and counterclaims, seeking declaratory judgment, injunctive relief, and money damages. The trial court eventually entered a permanent injunction enjoining the servient estate from interfering with the dominant estate's use and enjoyment of the easements over the alley, and the case proceeded to a trial on damages. *Metropolitan*, 2014 IL App (1st) 130307, ¶¶ 11, 14.

- 11 -

¶ 25 *Metropolitan* arose from a dispute about the scope of easements and whether the servient estate holder intentionally blocked them; nonetheless, the appeal did not consider, let alone analyze, intentional interference with an easement. To be sure, the First District Appellate Court noted the servient estate did not "contest[ ] in any way the trial court's finding that it did, in fact, intentionally interfere with the [dominant estate's] right to use the Alley" and the court's analysis considered intentional interference "an established fact." *Metropolitan*, 2014 IL App (1st) 130307, ¶ 50. However, in the course of determining whether the economic loss doctrine applied to intentional torts like intentional interference with an easement as it relates to damages, the First District wrote: "Similar to the torts of intentional interference with a contract or with prospective business advantage, a claim of intentional interference with an easement seeks to protect the interests of those in possession of real property against unreasonable interference with their rights to access and use their property." *Metropolitan*, 2014 IL App (1st) 130307, ¶ 60. The First District cited no authority for this statement. Nevertheless, the Somerses pluck it from *Metropolitan* to argue, "[b]ecause these torts are similar and comparable, the Court should determine intentionality in the same way for both torts." They lay out the following analytic framework and urge us to apply it here.

¶ 26 Citing *HPI Health Care Services, Inc. v. Mt. Vernon Hospital, Inc.*, 131 Ill. 2d 145, 156 (1989), a case considering the tort of intentional interference with existing contract rights, the Somerses maintain the circuit court should first determine whether their actions in blocking the easement were privileged before finding they acted intentionally. Privileged conduct protects an interest equal to or greater than the opposing party's interest. See *HPI Health Care Services, Inc.*, 131 Ill. 2d at 157. Here, the Somerses believe their interest in enclosing their horses is of equal (or even greater) value to Downing's interest in accessing farmland. If a party establishes its conduct

was privileged, then the opposing party must plead and prove the conduct was unjustified or malicious. *HPI Health Care Services, Inc.*, 131 Ill. 2d at 156. According to the Somerses, they established their actions were privileged, placing the burden on Downing to plead and prove their conduct was unjustified or malicious. Since Downing did not make such a showing, they reason summary judgment was inappropriate.

¶ 27        While we can track the Somerses' reasoning, we cannot follow it to the conclusion they desire. Simply put, this proposed framework finds no support in established property law. Besides one throwaway, uncited sentence in *Metropolitan*, a case that does not consider property law, the Somerses cite no case where a court actually analyzed intentional interference with an easement in the same way it analyzes intentional interference with a contract or business advantage. We will not embrace the Somerses' proposed approach when property law already outlines what constitutes intentional conduct.

¶ 28        In property law, intentionality is assessed by the terms "deliberate" or "willful disregard." *Malchow v. Tiarks*, 122 Ill. App. 2d 304, 312, 258 N.E.2d 811, 815 (1970) ("For an encroachment to be intentional, it must be either deliberate or in willful disregard of the rights of the adjoining property owner."). An act "will be deemed deliberate if made after due warning" that it would infringe on another property owner's rights. *Calhoon v. Communications Systems Construction, Inc.*, 140 Ill. App. 3d 1012, 1017, 489 N.E.2d 23, 26-27 (1986) (citing *Malchow*, 122 Ill. App. 2d at 312). Willful disregard can be described as failure to exercise any appreciable precaution regarding the rights of another property owner. *Cammers v. Marion Cablevision*, 26 Ill. App. 3d 176, 180, 325 N.E.2d 62, 66 (1975). Willful disregard may also arise from culpable negligence, defined as "failure to take ordinary and reasonable precaution to ascertain the boundary line." *Malchow*, 122 Ill. App. 2d at 312.

¶ 29        Applying these definitions from property law to the facts before us, we agree with the circuit court's finding they intentionally blocked the easement. To be sure, the Somerses' conduct in this matter is best described as deliberate and done in willful disregard to Downing's rights under the easement. The designated evidence established Downing held an access easement over the 60 acres the Somerses bought at auction in 2005. Consequently, Downing had the right to necessary use of the easement—namely, unobstructed use. See *McMahon*, 298 Ill. App. 3d at 236. Since this was an easement appurtenant, it ran with land, meaning the Somerses' title to the 60 acres carried the burden of the easement. The Somerses clearly knew of the easement and even sought its release in 2005. When Downing did not release the easement, the Somerses began using the easement in a manner inconsistent with its character as a means of accessing farmland. They disked the land and planted grass and trees over the easement until Downing complained. Despite this due warning, and without any appreciable precaution for Downing's property interest (*Cammers*, 26 Ill. App. 3d at 180), the Somerses then installed fences across the easement to pasture horses, totally blocking the easement and preventing its use as a way to access the farmland for 12 years. When Downing asked the Somerses to remove the fences, they did nothing. When the Somerses eventually installed gates, they were too small. They then installed larger double gates, secured by chains and GateHands, which is "a system of closing and securing gates that helps prevent a lot of wind movement" where "[y]ou take the cotter pin out, flip the thing in and pull them apart." At the time this suit began, Downing had to pass through three sets of gates to use the easement. The Somerses would have the circuit court, and this court, overlook their conduct prior to when they installed gates in 2020 and focus on gates only. But their conduct on the whole shows they intentionally obstructed the easement.

¶ 30    The Somerses attempt to characterize their conduct as intentionally *corralling their horses*, not intentionally *blocking the easement*—as if the two purposes are mutually exclusive. They are not. They further urge us to chart new ground in evaluating the intentionality element for intentional interference with an easement. We will not. Under well-settled property law, the Somerses intentionally interfered with Downing's use of the easement by using their land for a purpose inconsistent with the access easement. See *McMahon*, 298 Ill. App. 3d at 239; *Malchow*, 122 Ill. App. 2d at 312. The easement was created for the purpose of giving the Whites, and now their heirs, access to County Road 700 from their farmland and a means of ingress and egress to their farmland from the county road. The easement ran with the land, meaning the Somerses took title to the 60 acres burdened with the easement. *Aebischer*, 56 Ill. App. 3d at 155. From the outset, in willful disregard for Downing's property interest, the Somerses deliberately obstructed the easement, making it " 'less fit for the service for which it was acquired.' " *Peoples Gas Light*, 256 Ill. App. at 368 (quoting Leonard A. Jones, A Treatise on the Law of Easements, § 832, at 669 (1898)). The circuit court's finding they intentionally blocked the easement is not contrary to law.

¶ 31                    B. The Case Turns Upon Use, Not Gates

¶ 32    The Somerses next argue the circuit court erroneously granted summary judgment because there remained a genuine issue of material fact as to whether the Somerses acted reasonably in obstructing the easement. Specifically, they maintain "[t]he court misapplied the law" because "gates across easements are reasonable impediments when they are necessary to keep livestock safe." The Somerses seemingly believe reasonableness is a necessary consideration before a circuit court can enter an injunction enjoining intentional interference with an easement, forgetting they previously acknowledged, "The circuit court can decline to balance the equities when there is an intentional blockage of an easement." (citing *Seymour*, 264 Ill. App. 3d at 603).

Intuitively, if not practically, a finding of intentional interference with an easement neutralizes a reasonableness argument, allowing the court to enter the injunction without balancing the equities. If, having due warning, a party deliberately or in willful disregard obstructs another's property interest, it is difficult to envision a circumstance where basic principles of property law will simultaneously consider it reasonable.

¶ 33     Undeterred, the Somerses argue there is a "long line of Illinois cases that recognize that gates across easements are reasonable if they are needed to keep in livestock." In support, the Somerses cite *Schaefer*, which actually found a gate *unreasonable* but in doing so distinguished three cases where gates were found to be reasonable. Three cases hardly form a long line. Nevertheless, each of the cases cited in *Schaefer* are distinguishable from the case before us and, more importantly, do not stand for an overarching rule that gates are reasonable obstructions to an easement if they keep in livestock. As the *Schaefer* court noted, in *Leesch v. Krause*, 393 Ill. 124, 65 N.E.2d 370 (1946), "the owners of the right of way by prescription had always opened and closed gates, and hence took their easement with that burden." *Schaefer*, 13 Ill. 2d at 469. There the gate was reasonable because the easement came with a gate, not because it was necessary to corral livestock.

¶ 34     Likewise, in *Truax v. Gregory*, 196 Ill. 83, 63 N.E. 674 (1902), when the easement was granted, there was *already* a gate at the terminus where the right of way intersected the public highway. Since Gregory took his easement with a preexisting gate, the *Truax* court held he could not remove it. *Truax*, 196 Ill. at 90. But more importantly, while the *Truax* court said the gate must stay, it also gave the following admonition:

> "It seems proper to remark that though the right of way in
>
> question is but an easement, and though plaintiff in error has mutual

right with defendant in error to use the same for all the purposes of a 'right of way,' yet she has not the right to make other uses of it which are inconsistent with its character as a private way or 'right of way.' It cannot be lawfully used by her or her tenants as a cattle yard or place for feeding or keeping stock or farm animals. It is a way for ingress and egress for those entitled to use it, and cannot lawfully be devoted to purposes inconsistent with such use of it."

*Truax*, 196 Ill. at 90.

Truax, like *Leesch*, is distinguishable and on the whole does not support a general rule that gates over an easement are always reasonable when used to corral livestock. Instead, as the above-quoted language reinforces to us, the servient landholder cannot put the encumbered land to a use inconsistent with the easement and then claim a right to do so. See *McMahon*, 298 Ill. App. 3d at 239.

¶ 35        The Somerses rely heavily on the final case cited in *Schaefer*. They direct our attention to *Green v. Goff*, 44 Ill. App. 589 (1892), *aff'd*, *Green v. Goff*, 153 Ill. 534, 39 N.E.975 (1894), arguing it is directly on point and controlling here. We disagree. There, Green owned "a tract of land, on the north line of which there was a pond of water, easterly from and near to a highway running through the tract." *Green*, 153 Ill. at 535. He conveyed a parcel of land to Richard Lewis but reserved for himself unidentified rights of way to the pond where he watered cattle, to a wood lot, and to a spring on the eastern side of the wood lot. *Green*, 153 Ill. at 535. Over the years, since the land abutted a highway, Green and the public traversed the Green and Lewis parcels to get to the pond, "no one particular and limited line of travel was used by either persons or stock," and people " 'traveled where it suited [their] convenience.' " *Green*, 153 Ill. at 541. At

some point a " 'track made by wagons and cattle reached to a width of three rods, \*\*\* and the track was used [by Green] oftener in going to the wood lot than to the pond.' " *Green*, 153 Ill. at 541. The land remained open until Lewis conveyed his parcel to Goff, who then enclosed it for agricultural purposes and placed a gate across the right of way to keep Green's livestock from trampling the crops. *Green*, 153 Ill. at 535. Citing other jurisdictions, the court noted: "It has been uniformly held that the erection of gates or bars at the termini of a private way is not an unreasonable interference with the use of the way." *Green*, 153 Ill. at 536. The court held Goff "had the right to erect and maintain the gate in question as a legitimate exercise of his right as the owner of the fee, *unless* some fact or circumstance outside the terms of the grant has changed the rights of the parties." (Emphasis added.) *Green*, 153 Ill. at 537.

¶ 36 The differences between *Green* and this case abound. We initially note *Green* appears to have been decided on its own unique facts, evidenced by the caveat the court added that legitimate use by the servient estate may depend on facts or circumstances outside the grant. *Green*, 153 Ill. at 537. In that case, the right of way was not located in the initial grant and Green (along with others) used various ways to get to the pond over the years. Our supreme court took pains to note the right of way's who, what, when, where, and how had changed several times before Goff enclosed his land and erected a gate. *Green*, 153 Ill. at 540-42. Here, the easement's location and use had not changed until the Somerses blocked all use by Downing. There, the court also emphasized Goff's important interest in keeping the public from his land and crops. *Green*, 153 Ill. at 536. There is no such consideration here. We further note Goff placed only one gate at the end of the right of way and enclosed the rest of his land for crops. The Somerses, by contrast, enclosed the easement with three sets of double gates. Most importantly, unlike the Somerses, Goff was not using the easement in a manner inconsistent with its function or use as a right of way. He

fenced his own land and put one gate at the end of the way to the pond. He did not use the easement to plant crops or pasture or keep livestock. Here, the Somerses have put the easement to a completely different use than the one to which it was devoted. They initially planted grass and trees and now they use it to pasture horses, which is totally inconsistent with its use as an access easement. See *Truax*, 196 Ill. at 90; see also *Espenscheid v. Bauer*, 235 Ill. 172 (1908). Despite the Somerses' claims, *Green* did not begin a long line of cases establishing that gates over easements are always reasonable when used to keep livestock. In our view, *Leesch*, *Truax*, and *Green* were decided on their particular facts, which are distinguishable from the facts before us here.

¶ 37       We find this case more comparable to *Espenscheid*. There, Espenscheid held title to a farm dating back to 1878, and his father had held the land from 1848. For more than 50 years, the Espenscheids accessed their farm by a lane that intersected with a public highway. The lane was the only means of access to the farm. Espenscheid thus enjoyed an easement by prescription over the lane. Bauer took title to his adjoining land in 1896 or 1897 and began making changes almost immediately. *Espenscheid*, 235 Ill. at 173. He also allowed cattle to roam the easement, prompting Espenscheid to move a fence to protect his peach trees. Bauer later made more changes to the easement, moving fences and gates, digging several small drains across the lane, and continuing to pasture his cattle in the lane. *Espenscheid*, 235 Ill. at 174. Eventually, Bauer erected a fence over the lane that cut off Espenscheid's access to the lane and his property. *Espenscheid*, 235 Ill. at 175. Espenscheid sued to prohibit Bauer from blocking the easement. The circuit court entered an injunction, "enjoining *** Bauer *** from erecting or maintaining obstacles of any kind in a certain lane about 20 feet in width, and from pasturing stock therein, and also

commanding him to remove all obstacles already placed in said lane." *Espenscheid*, 235 Ill. at 172. Bauer appealed.

¶ 38    Our supreme court affirmed, finding the evidence "show[ed] without contradiction" that Espenscheid held an "easement or right of passage" over Bauer's land. *Espenscheid*, 235 Ill. at 175. The court further noted injunctions are properly granted "to prevent the erection of a gate across a private alley" when "an abutting owner [has] an easement over such alley." *Espenscheid*, 235 Ill. at 176 (citing *Smith v. Young*, 160 Ill. 163, 43 N.E. 486 (1896)). The supreme court explained a servient estate does not have the right to use the land comprising the easement for purposes inconsistent with its character as a right of way. The court reiterated an easement for right of access "cannot lawfully be used as a place for feeding, keeping or grazing stock" because " '[i]t is a way for ingress and egress for those entitled to use it, and cannot lawfully be devoted to purposes inconsistent with such use of it.' " *Espenscheid*, 235 at 177 (quoting *Truax*, 196 Ill. at 90). Our supreme court responded to Bauer's argument the injunction was unnecessary because part of the obstructions had since been removed, by noting the record obviously showed a wire fence and gate obstructed the easement when Espenscheid filed suit. The court went on to conclude the injunction was necessary because

> "[i]t is also very plain from this record that there is reasonable
> ground for believing that [Bauer] will use the right of way in
> question, for pasturing or other purposes, in a manner inconsistent
> with its character as a private right of way for [Espenscheid] unless
> restrained from doing so." *Espenscheid*, 235 Ill. at 177.

Though Bauer asked the supreme court to take account only of the current situation, as Espenscheid had removed part of the fence to use the easement, the supreme court noted Bauer's course of conduct in routinely obstructing the easement.

¶ 39   Like Bauer, since taking title to the 60 acres surrounding their home, the Somerses routinely blocked the easement by putting the land to a use inconsistent with its character as an access easement for ingress and egress. Just as Bauer dug drains along the lane, the Somerses disked the land and then planted grass and trees, altering its suitability for use as an access easement. Both Bauer and the Somerses fenced the respective easements, making access by the dominant estate holder impossible. And like Bauer, the Somerses changed the easement's character by making it a pasture for livestock—an unlawful use. See *Espenscheid*, 235 Ill. at 176. Bauer asked the court to consider only the current character of the obstruction, and the Somerses likewise ask us to focus solely on the gates and overlook the prior obstructions. But, like the *Espenscheid* court, we must look at the whole course of conduct.

¶ 40   The Somerses strive to narrow this case down to gates and reasonableness, believing if it is about what is reasonable, then they automatically survive summary judgment. Reasonableness is a fact question, after all. See *McMahon*, 298 Ill. App. 3d at 239-40. This case, however, is about the broader issue of use. Illinois law soundly holds that the owner of a servient estate who takes land subject to an easement may not put the land to use inconsistent with the easement's purpose. See *Peoples Gas Light*, 256 Ill. App. at 367; *McMahon*, 298 Ill. App. 3d at 239; *Espenscheid*, 235 Ill. at 176-77. The Somerses acknowledged they used the easement in an obstructive manner out of convenience for keeping their horses. The circuit court rightly found the Somerses intentionally interfered with Downing's easement and properly entered an injunction. See *Seymour*, 264 Ill. App. 3d at 596 (stating injunctions are appropriate for even minor

interference with an easement). Similarly, the court's decision to decline to balance the equities in this matter also comports with Illinois law. See *Seymour*, 264 Ill. App. 3d at 603; *Borrowman*, 119 Ill. App. 3d at 502; *Bjork v. Draper*, 381 Ill. App. 3d 528, 542, 886 N.E.2d 563, 575 (2008).

¶ 41          C. The Injunction Properly Secured the Parties' Rights Under the Easement

¶ 42          In their final argument, the Somerses contend the circuit court's order effectively deprived them of the use of their land, gave Downing ownership of the easement, and, in turn, gave them an easement across their own land. This argument asks us to weigh the interests at stake and do equity. Such a task is not part of our responsibility in this case. We review the claims of error and determine whether the court properly granted summary judgment and whether it abused its discretion in granting injunctive relief. The court reviewed the designated evidence and determined it established, as a matter of law, the Somerses intentionally obstructed the easement. It then decided against considering the equities, as it can, and entered declaratory judgment and injunctive relief for Downing. As we have explained *supra*, all those decisions align with established Illinois law. "[T]he granting or denying of injunctive relief is a discretionary ruling by a circuit court, and, absent an abuse of its discretion, a court's ruling will not be overturned upon review." *Schnuck Markets*, 213 Ill. App. 3d at 974. On this record, we cannot say the court abused its discretion in foregoing the equities and entering the injunction.

¶ 43          To the extent the Somerses' argument does not seek equity but asks us to pass upon the propriety of the circuit court's decision, it repeats their first two arguments and merits the same decision. We see no error in the court's decision. The Somerses have intentionally blocked the easement since 2005, putting it to a use inconsistent with its character as an access easement for ingress and egress. Under Illinois law, courts rightly enter injunctive relief when a servient estate intentionally interferes with the dominant estate's use of the easement. Because they acted

- 22 -

intentionally (deliberately and in willful disregard of Downing's property interest), the equities need not be balanced here. *Seymour*, 264 Ill. App. 3d at 603. The Somerses understandably lament the injunction's impact, believing it overly favors Downing. But when giving effect to an easement granted by deed, the law benefits the dominant estate—"to the extent for which it is necessary to carry out the purpose of the grant, the rights of the owner of the easement are paramount." (Internal quotation marks omitted.) *Schnuck Markets*, 213 Ill. App. at 974.

¶ 44                                    III. CONCLUSION

¶ 45         For the reasons stated, we affirm the circuit court's judgment.

¶ 46         Affirmed.

*Downing v. Somers*, 2023 IL App (4th) 220900

| | |
|---|---|
| **Decision Under Review:** | Appeal from the Circuit Court of McLean County, No. 21-MR-147; the Hon. Rebecca S. Foley, Judge, presiding. |
| **Attorneys for Appellant:** | James J. Schmidt, of Meyer Capel, of Champaign, for appellants. |
| **Attorneys for Appellee:** | Barry O. Hines, of Springfield, for appellees. |